IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| DIANA UNDERWOOD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 01-PT-3054-M |
| ) | |
| KNIGHT PETROLEUM COMPANY, ) | |
| INC., d/b/a GUNTERSVILLE CHEVRON, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

This cause comes on to be heard upon Defendant Knight Petroleum Company, Inc. d/b/a Guntersville Chevron's ("KPC") Motion for Summary Judgment, filed on November 22, 2002.

**FACTS AND PROCEDURAL HISTORY**

Plaintiff[1] Diana Underwood ("Underwood"), a Caucasian, was hired by KPC as a manager or manager in training on or around June 4, 1999. Steven Knight ("Knight") was the President of KPC at the time that Underwood was hired. Underwood was hired by Ann Cook ("Cook"), who was an Area Supervisor for KPC. Cook remained Underwood's supervisor during the latter's employment with KPC.

At the time that Underwood was hired, there were four individuals employed at the Guntersville Chevron store. These employees were under Underwood's supervision. Thereafter, one employee quit or was terminated, and the need arose to hire another employee. Underwood interviewed Carla Moore ("Moore"), an African American, and was impressed enough by Moore to want to hire her. Underwood made clear to Cook that she wanted to hire Moore for the

---

[1] Plaintiffs Carla Moore and Shameka Griffin were dismissed by order of the court on December 16, 2002.



position. During this conversation, Underwood contends, Cook told her that Knight had said that he did not want to hire any more blacks at the store. *See* Pl. Ex. 1 at 97. Cook and Knight deny this charge. *See* Pl. Ex. 2 at 98.

After the alleged discussion that Underwood had with Cook, Cook sent two applications from the Albertville store for Underwood to review. There seems to be some dispute as to whether these two applicants were hired, *see* Pl. Br. at ¶ 7; Def. Br. at ¶ 7, but there is no dispute that Underwood hired Moore for the position on July 29, 1999. There is no dispute that Underwood had, at that time, the authority to hire, discipline, and fire employees. She also had the authority to interview prospective employees, open the store, do the inventory for the store, make orders for the store, and make the work schedule. She also had the duties of a cashier or clerk if she was working alone in the station. Underwood contends that after she hired Moore, her various managerial job duties were reduced and/or eliminated. *See* Pl. Ex. 1 at 108-16. Again, Cook and Knight deny that this happened. *See* Pl. Ex. 2 at 86-88. Underwood eventually resigned from her position. She contends that the adverse actions taken against her made the working environment "intolerable."

By contrast, KPC notes that Underwood received a raise on August 11, 1999, a few weeks after Moore was hired. *See* Def. Ex. 1, depo. exhibit 3; Ex. 4. KPC also points out that Underwood, shortly before she resigned, had complained about the long, "ungodly" working hours, to the point that Cook came in to relieve Underwood on one occasion. *See* Def. Ex. 1 at 81-83. Cook gave Underwood time off from August 26-28, 1999. *Id.* at 81-82, 136-39, 164. When she returned to work, Underwood had another conversation with Cook about the working conditions, although KPC contends that this discussion did not involve any talk of discrimination

2

or retaliation. *Id.* at 137-39. The next day, August 29, Underwood worked without incident, although she apparently did speak with Sharon Pendergrass, an employee in KPC's main office, about her duties being reduced. *Id.* at 119-20. On August 30, Underwood had a discussion with Cook about her job duties being reduced. *Id.* at 141-43. She told Cook that "I am afraid that I could be sued myself for discrimination," and that events at the store "[have] bothered me for about two weeks now." After failing to resolve their differences, Underwood turned in her resignation.[2] That same day, Underwood, apparently for the first time, attempted to contact Knight about her working conditions, although the two never actually met to discuss the problem. *Id.* at 119, 148-51.

Underwood filed this suit on November 30, 2001, alleging unlawful retaliation under Title VII (Count VII), and the tort of outrage (Count V).[3]

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could

---

[2] Moore resigned on August 28, 1999. *See* Def. Ex. 2 at 56-57, 71.

[3] Underwood also alleged disparate impact under Title VII (Count III), and the tort of negligent training, supervision, and retention (Count VI). However, she concedes that summary judgment is appropriate as to these two counts. *See* Pl. Br. at ¶ 2.

3

not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay*, 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I. Plaintiff's Position

Underwood cites 42 U.S.C. § 2000e-3(a), which provides, in part, that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful practice . . . ." Underwood argues that, by hiring a minority against her employer's wishes, she "was engaged in protected opposition to

4

Title VII discrimination . . . ." *See* Pl. Br. at ¶ 1(a)(i). Underwood also argues that an employee suffers an adverse employment action whenever she endures a "materially adverse change" in the terms and conditions of employment, which exists where there are "significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Mendlesohn v. Univ. Hosp.*, 178 F. Supp. 2d 323, 329 (E.D.N.Y. 2002) (citations omitted). She argues that by reducing and/or eliminating her job duties, KPC made a "materially adverse change" in the terms and conditions of her employment. Underwood contends that these changes made her work environment intolerable, and therefore her resignation constituted a constructive discharge by KPC.

Next, Underwood points to the factual disputes at to whether Knight and/or Cook made the comments about hiring more blacks, and whether Underwood's job duties were reduced and/or eliminated. Given these factual disputes, Underwood argues, summary judgment is inappropriate at this stage. "Where the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence." *Mize v. Jeffereson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). Direct evidence is found, Underwood argues, where "actions or statements of an employer reflect[] a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990). Here, Underwood contends, the alleged comments of Knight/Cook and the reduction of her duties are direct evidence of retaliation.

With respect to the outrage claim, Underwood asserts that a jury could find that the alleged conduct on the part of Knight/Cook/KPC was "so severe that no reasonable person could

be expected to endure it." *American Road Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1981). Underwood acknowledges that the tort of outrage should be applied only in egregious circumstances, but she also notes that the Alabama Supreme Court has applied the tort to extreme sexual harassment claims. *See Busby v. Truswal Sys. Corp.*, 551 So. 2d 322 (Ala. 1989).

## II. Defendant's Response

KPC contends that even if there are factual disputes, they are not of a material nature that would preclude summary judgment. Also, KPC argues, hiring Moore cannot be seen as "protected activity" under Title VII. Further, KPC asserts, the remarks allegedly made by Knight/Cook would be irrelevant to a retaliation claim, presumably because Underwood did not complain to Cook about the discrimination until the day she resigned. *See Snellgrove v. Teledyne Abbeville*, 117 F. Supp. 2d 1218 (M.D. Ala. 1999) (holding that plaintiff failed to establish prima facie case of retaliatory discipline, absent any evidence that she made complaints regarding sex discrimination to any personnel or plant manager that pre-dated her discipline). As to Underwood's working conditions, KPC notes that Underwood received a raise from $7.00 per hour to a salary of $325 per week on August 11, 1999, a few weeks after Moore was hired. KPC also notes that she did not complain to anyone about her working conditions in general until a few days before she resigned, and that she did not make a specific complaint about the reduction in duties until the *day before* she resigned, even though she stated that it had been bothering her for a couple of weeks. KPC asserts that these facts preclude Underwood from making a claim of retaliation or constructive discharge, especially in light of the fact that

6

Underwood freely and voluntarily resigned from her employment with KPC.[4]

As to the outrage claim, KPC contends that Underwood has presented no evidence of conduct so outrageous so as to be regarded as atrocious and utterly intolerable in a civilized society. *Matthews v. Alabama A&M Univ.*, 787 So. 2d 691 (Ala. 2000).

### III. Plaintiff's Reply

Underwood argues that to establish a *prima facie* of retaliation, a plaintiff must show (1) that she engaged in protected activity, (2) that her employer took an adverse employment action against her, and (3) that there is a causal connection between the two. *See Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 701 (11th Cir. 1998). Underwood contends that hiring African Americans, who are qualified for the job, is protected activity under Title VII.[5] Moreover, Underwood argues, since Knight/Cook told her not to employ any more African American employees, hiring Moore anyway should be seen as opposition to KPC's unlawful practices. Thus, the first prong is met. Moreover, Underwood contends, the second and third prongs are met, because not long after she hired Moore, KPC reduced and/or eliminated her job duties. Underwood acknowledges that she was given a "raise" to $325 per week, but contends that she actually made more money as an hourly employee. *See* Pl. Reply Ex. 1. Thus, rather than being a raise, the change was actually an adverse employment action. Again, Underwood asserts, there is enough "direct evidence" to create a genuine issue of material fact as to the retaliation claim.

Underwood also argues that KPC's argument regarding the timing of her complaints to

---

[4] KPC also contends that Underwood stole paperwork from the Guntersville Chevron before she left. *See* Def. Br. at 11.

[5] This court tends to agree.

7

Cook is immaterial and irrelevant. There is nothing in the retaliation *prima facie* case, Underwood contends, that would require her to make a complaint within a specified time-frame. Rather, Underwood argues, she need only show that her working conditions were "so intolerable that a reasonable person in her position would have been compelled to resign." *Poole v. Country Club of Columbus*, 129 F.3d 551, 553 (11th Cir. 1997). Underwood contends that no reasonable person should be required to work in an environment that excludes whole classes or persons and that would reduce and/or eliminate a person's job duties for not joining in the exclusion.[6]

As to the outrage claim, Underwood argues, engaging in an employment scheme so as to preclude an entire protected class from having access to available jobs represents atrocious and intolerable conduct. Underwood also notes that KPC, while having 173 total employees, has only six (6) African American employees. *See* Pl. Reply Ex. 2. Underwood contends that this evidence shows KPC's propensity to discriminate against an entire protected class.

## CONCLUSIONS OF THE COURT

The court starts with two conclusions that require little discussion. First, the facts, even as stated by Underwood, do not rise to the level of an outrage claim under Alabama law. Such claims are almost automatically made in all tort-type cases. Few have survived Supreme Court of Alabama scrutiny. Also, the constructive discharge claim requires little discussion. As the Eleventh Circuit has observed,

> The law in this circuit with respect to constructive discharge is well-established. To show constructive discharge, the employee must prove that his working conditions were so difficult or unpleasant that a reasonable person would have felt compelled to resign. . . . Before finding a constructive discharge, this court has traditionally required a high degree of deterioration in an employee's working

---

[6]Underwood also argues that KPC's allegations of theft should be stricken because they are not supported by the evidence and have no bearing on this Motion.

conditions, approaching the level of "intolerable."

*Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d 1518, 1527 (11th Cir. 1991) (citations omitted). Subsequent cases have affirmed this high standard. *See, e.g., Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002) ("[A] a constructive discharge claim does not present a jury issue unless a plaintiff produces substantial evidence that conditions were intolerable."); *Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1201 (11th Cir. 2001) ("Although Houldsworth asserts a claim of constructive discharge, her working conditions were not 'so difficult ... that a reasonable person would have felt compelled to resign.'"); *Durley v. APAC, Inc.*, 236 F.3d 651, 658 (11th Cir. 2000) ("In order to successfully state a claim, however, Durley was required to 'demonstrate that working conditions were "so intolerable that a reasonable person in her position would have been compelled to resign."'"). The evidence in this case does not reach that level.

The only substantial issue is whether there was an "adverse employment action," which is an essential element of a retaliation claim. The Eleventh Circuit has recently articulated a standard for what constitutes an adverse employment action in this context:

> Whatever the benchmark, it is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the "terms, conditions, or privileges" of the plaintiff's job in a real and demonstrable way. Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment. We therefore hold that, to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

*Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original).[7] Here, there is some evidence that, although placed on salary, Underwood actually made less money than she did before Moore was hired. *See* Pl. Reply Ex. 1.[8] And although KPC denies this, Underwood contends that, after she hired Moore, her various managerial job duties were reduced and/or eliminated. *See* Pl. Ex. 1 at 108-16. In *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998), the court held that "Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions." The court later found an adverse employment action when an employer, among other things, gave an employee less duties than other employees in the same position. *See Bass v. Board of County Com'rs, Orange County*, 256 F.3d 1095, 1118-19 (11th Cir. 2001).[9] This court is not able, at this stage, to conclude, as a matter of law, that there was not a serious and material change in the terms and conditions of employment. The court will carefully consider the evidence at trial. If it is determined that someone is being untruthful, sanctions may be appropriate.

In summary, the court will grant the Motion as to the outrage claim. The court will deny the Motion as to the retaliation claim, except to the extent that such a claim is based on a theory of constructive discharge.

---

[7]*Davis* did not specifically deal with a retaliation claim. However, the court noted that the "adverse action requirement . . . has been imposed in cases under Title VII's retaliation clause . . . ." 245 F.3d at 1238.

[8]For example, Underwood grossed $332.50, $400.75, $377.13, and $366.63 for the pay periods ending 6/19, 6/26, 7/3, and 7/10/99, respectively.

[9]The court did note however, that "[w]hile the other actions *might not have individually risen to the level of adverse employment action under Title VII*, when those actions are considered collectively, the total weight of them does constitute an adverse employment action." *Id.* at 1118 (emphasis added).

This __7th__ day of February, 2003.

*/s/ Robert B. Propst*
**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT COURT**